Citation Nr: 1513847 
Decision Date: 03/31/15 Archive Date: 04/03/15

DOCKET NO. 14-38 514 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Denver, Colorado


THE ISSUES

1. Entitlement to service connection for vertigo, to include as secondary to service-connected tinnitus.

2. Entitlement to service connection for a left knee disorder.

3. Entitlement to a higher initial rating for bilateral hearing loss, evaluated as 0 percent disabling prior to June 5, 2010, 20 percent disabling from June 5, 2010, and 40 percent disabling from November 26, 2012.

(The issues of entitlement to a higher initial rating for degenerative disc disease (DDD) of the lumbar spine, evaluated as 10 percent disabling prior to February 18, 2010, 20 percent disabling from February 18, 2010, 40 percent disabling from May 12, 2011, and 20 percent disabling from November 26, 2012, and entitlement to a total disability rating based on individual unemployability due to service-connected disabilities (TDIU); and whether new and material evidence has been presented to reopen a claim for service connection for a right eye disability, will be addressed in separate decisions.)

REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESS AT HEARING ON APPEAL

Appellant


ATTORNEY FOR THE BOARD

Sarah Richmond, Counsel


INTRODUCTION

The Veteran served on active duty from November 1945 to May 1948, and, from
October 1950 to July 1968.
 
This appeal to the Board of Veterans' Appeals (Board) arises from January 2009 and May 2009 rating decisions. In January 2009, the RO, inter alia, granted service connection for bilateral hearing loss, and assigned an initial noncompensable (0 percent) rating, effective September 9, 2008. The RO, in pertinent part, denied service connection for a left knee disorder and vertigo, to include as secondary to tinnitus in May 2009. In November 2009, the Board remanded these matters to the RO as the record showed that the Veteran had filed notices of disagreement with the January and May 2009 rating decision, but had not been issued a statement of the case. Thereafter the Veteran appealed these decisions to the Board.

In December 2010, the RO granted a 20 percent rating for bilateral hearing loss, effective June 5, 2010. The Veteran has not indicated that he is satisfied with this rating. Thus, this claim is still before the Board. AB v. Brown, 6 Vet. App. 35 (1993).

In June 2011, the Veteran testified during a hearing before the undersigned Veterans Law Judge at the RO; a transcript of that hearing is of record. During the hearing, the undersigned granted the motion of the Veteran's representative to advance this appeal on the Board's docket, pursuant to 38 U.S.C.A. § 7107(a)(2)(C) (West 2014); 38 C.F.R. § 20.900(c) (2014).

In a January 2011 written statement, the Veteran indicated that he wanted to withdraw his pending appeals except for his vision and left knee disorder. Despite the January 2011 letter, subsequent communication from the Veteran and his representative does not reflect the desire to withdraw the other claims on appeal. Indeed, during the June 2011 hearing, the Veteran provided testimony regarding each of the claims listed on the title page. Thus, these matters remain in appellate status. 

In addition to presenting testimony regarding the claims listed on the title page during his June 2011 hearing, the Veteran also testified regarding a claim for a higher rating for a service-connected lumbar spine disability. This issue had previously been addressed during a Board hearing before another Veterans Law Judge in August 2009. In October 2011, the Veteran was provided with the opportunity to testify at a hearing before the third member of the decision panel regarding his claim for a higher initial rating for his lumbar spine disability, pursuant to 38 U.S.C.A. § 7107(c) (West 2014); 38 C.F.R. § 20.707 (2014). 

In a November 2011 response to the October 2011 letter, the Veteran requested a videoconference hearing before a third Veterans Law Judge. Accordingly, in January 2012, the case was remanded to afford the Veteran his requested hearing. A March 2012 letter advised the Veteran that he was scheduled for a hearing before a Veterans Law Judge at the RO in April 2012; however, on the date of his scheduled hearing, the Veteran withdrew his hearing request and asked that a decision be made from the evidence on file. See 38 C.F.R. § 20.704(e) (2014). There are no outstanding hearing requests of record. As noted on the title page, the claim for a higher initial rating for DDD of the lumbar spine is being addressed in a separate Board decision. 

The Board remanded this case for additional development in July 2012. During the course of the remand, in March 2013, the RO granted an increased rating of 40 percent for the bilateral hearing loss disability, effective November 26, 2012. The Veteran has not indicated that he is satisfied with this rating. Thus, this claim is still before the Board. AB v. Brown, 6 Vet. App. 35 (1993). The case is now returned for appellate review.

As noted, this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). 38 U.S.C.A. § 7107(a)(2) (West 2014).

The issues of service connection for vertigo and a left knee disability are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDING OF FACT

The Veteran's hearing loss is manifested by no more than Level II hearing in the right ear and IV in the left, effective prior to June 5, 2010; Level IV hearing in the right ear and VI in the left, effective June 5, 2010; and Level VII hearing in both ears, effective November 26, 2012


CONCLUSION OF LAW

The criteria for an evaluation in excess of (0 percent) prior to June 5, 2010, 20 percent from June 5, 2010, and 40 percent from November 26, 2012 for bilateral hearing loss are not met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.85, 4.86, Diagnostic Code 6100 (2014).




REASONS AND BASES FOR FINDING AND CONCLUSION

I. Duties to Notify and Assist

As provided for by the Veterans Claims Assistance Act of 2000 (VCAA), the United States Department of Veterans Affairs (VA) has a duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126; 38 C.F.R. §§ 3.102, 3.156(a), 3.159, and 3.326(a). 

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his or her representative, if any, of any information, and any medical or lay evidence, that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b); Quartuccio v. Principi, 16 Vet. App. 183 (2002). Proper notice from VA must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. 38 C.F.R. § 3.159(b). This notice must be provided prior to an initial unfavorable decision on a claim by the agency of original jurisdiction (AOJ). Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Pelegrini v. Principi, 18 Vet. App. 112 (2004). 

The claim for higher initial ratings for hearing loss arise from the Veteran's disagreement with the initial rating assigned in connection with the grant of service connection. The courts have held, and VA's General Counsel has agreed, that where an underlying claim for service connection has been granted and there is disagreement as to "downstream" questions, the claim has been substantiated and there is no need to provide additional VCAA notice or prejudice from absent VCAA notice. Hartman v. Nicholson, 483 F.3d 1311, 1314-15 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112, 116-17 (2007); VAOPGCPREC 8-2003 (2003). The United States Court of Appeals for Veterans Claims (Court) has elaborated that filing a notice of disagreement begins the appellate process, and any remaining concerns regarding evidence necessary to establish a more favorable decision with respect to downstream elements (such as a disability rating or effective date) are appropriately addressed under the notice provisions of 38 U.S.C.A. §§ 5104 and 7105 (West 2002). Goodwin v. Peake, 22 Vet. App. 128, 137 (2008). 

Regardless, the Veteran has received all essential notice, has had a meaningful opportunity to participate in the development of his claim, and is not prejudiced by any technical notice deficiency along the way. See Conway v. Principi, 353 F.3d 1369 (Fed. Cir. 2004). A letter satisfying the notice requirements was sent to the Veteran in September 2008, prior to the initial adjudication of the claim in January 2009. 

Next, VA has a duty to assist the Veteran in the development of the claim. This duty includes assisting him in the procurement of service treatment records and pertinent post-service treatment records and providing an examination when necessary. 38 U.S.C.A. § 5103A ; 38 C.F.R. § 3.159. 

The RO has obtained some of the Veteran's service treatment records and VA treatment records, as well as private treatment records. The Veteran was also afforded VA examinations in November 2008, June 2010, and November 2012 to address his hearing loss disability. The Board notes that the last examination for hearing loss was in November 2012, more than two years ago. However, the mere passage of time between the last examination and the Board's review does not automatically render the examination inadequate; there must be evidence of a change in the condition or allegation of worsening of the condition. Palczewski v. Nicholson, 21 Vet.App. 174, 182 (2007). In spite of the number of years that have passed since the last examination in November 2012, the Veteran has not argued, nor does the record show that the most recent VA examination is inadequate for rating purposes. 

In addition, the Veteran has not identified, and the record does not otherwise indicate, any additional existing evidence that is necessary for a fair adjudication of the claim that has not been obtained. While there are outstanding private treatment records from Drs. J., M., and B., the Veteran has never indicated that he received treatment for his hearing loss by these private providers, but instead has indicated that he received treatment for back, knee, and vertigo disabilities, and general internal care from these providers. VA treatment records in the virtual records show that the Veteran receives audiological treatment through VA including hearing aids. Therefore, the Board deduces that any additional private records obtained are not relevant to the hearing loss disability. 

The Veteran also has indicated that he is receiving Social Security Administration (SSA) benefits due to his age, and not for any disability. See August 16, 2012 VA Form 21-4138, Statement in Support of Claim. Therefore, the Board infers that any records from SSA would not be specific to his hearing loss disability. See Golz v. Shinseki, 590 F.3d 1317 (Fed. Cir. 2009) (VA's duty to assist limited to obtaining relevant SSA records).

The Court has held that "in addition to dictating objective test results, a VA audiologist must fully describe the functional effects caused by a hearing disability in his or her final report." Martinak v. Nicholson, 21 Vet. App. 447, 455 (2007). The Court's rationale for requiring an examiner to consider the functional effects of a Veteran's hearing loss pertained to cases where consideration of referral for an extra-schedular rating under 38 C.F.R. § 3.321(b) might be warranted. Specifically, the Court noted that, "unlike the rating schedule for hearing loss, § 3.321(b) does not rely exclusively on objective test results to determine whether a referral for an extra[- ]schedular rating is warranted. The Secretary's policy [requiring VA audiologists to describe the effect of a hearing disability on a Veteran's occupational functioning and daily activities] facilitates such determinations by requiring VA audiologists to provide information in anticipation of its possible application." Id. 

Here, the examiners in June 2010 and November 2012 addressed the functional effects of the Veteran's hearing loss, noting that the Veteran reported difficulty following instructions and difficulty hearing and understanding speech. The Veteran also testified at the June 2011 hearing that he had to wear headphones when watching television so as not to disturb others. See June 2011 Board hearing transcript, p. 20. Thus, the functional effects of his hearing loss are adequately addressed by the entirety of the record and are sufficient for the Board to consider whether referral for consideration of an extraschedular rating is warranted under 38 C.F.R. § 3.321(b). 

The Veteran was afforded a hearing before a Veterans Law Judge (VLJ) in June 2011, in which he presented oral argument regarding his hearing loss claim. In Bryant v. Shinseki, 23 Vet. App. 488 (2010), the United States Court of Appeals for Veterans Claims (Court) held that 38 C.F.R. § 3.103(c)(2) requires that the VLJ/DRO who chairs a hearing fulfill two duties to comply with the above the regulation. These duties consist of (1) the duty to fully explain the issues and (2) the duty to suggest the submission of evidence that may have been overlooked. Here, both the VLJ and the Veteran's representative acknowledged that the increased rating claim for hearing loss was on appeal and the Veteran provided testimony regarding the functional effects of his hearing loss on his daily life. The VLJ asked the Veteran questions directed at identifying the criteria for an increased rating for hearing loss. The Veteran also volunteered his treatment history and present symptoms. Neither the Veteran nor his representative has asserted that VA failed to comply with 38 C.F.R. § 3.103(c)(2), nor has he identified any prejudice in the conduct of the Board hearing. 

Accordingly, the duty to assist has been satisfied and there is no reasonable possibility that any further assistance to the Veteran by VA would be capable of substantiating his claim. See Soyini v. Derwinski, 1 Vet. App. 540, 546 (1991); Sabonis v. Brown, 6 Vet. App. 426, 430 (1994). Because VA's duties to notify and assist have been met, there is no prejudice to the Veteran in adjudicating this appeal. 

II. Initial Ratings for Hearing Loss 

As noted in the introduction, the RO granted service connection for bilateral hearing loss in a January 2009 rating decision, assigning a 0 percent rating, effective September 9, 2008. Thereafter, the RO assigned additional staged ratings for the hearing loss disability of 20 percent, effective June 5, 2010, and 40 percent, effective November 26, 2012. The Veteran seeks entitlement to higher disability ratings. 

Disability ratings are based on the average impairment of earning capacity resulting from a disability. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.1 (2014). An evaluation of the level of disability present includes consideration of the functional impairment of the Veteran's ability to engage in ordinary activities, including employment. 38 C.F.R. § 4.10. Separate diagnostic codes identify the various disabilities. Where there is a question as to which of two evaluations shall be applied, the higher evaluations will be assigned if the disability more closely approximates the criteria required for that rating. 38 C.F.R. § 4.7. Otherwise, the lower rating will be assigned. Id. 

In considering the severity of a disability, it is essential to trace the medical history of the veteran. 38 C.F.R. §§ 4.1, 4.2, 4.41. Consideration of the whole recorded history is necessary so that a rating may accurately reflect the elements of disability present. See 38 C.F.R. §§ 4.2; Peyton v. Derwinski, 1 Vet. App. 282 (1991). 

In Fenderson v. West, 12 Vet. App 119 (1999), the United States Court of Appeals for Veterans Claims (Court) emphasized the distinction between a new claim for an increased evaluation of a service-connected disability and a case, such as this one, in which a veteran expresses dissatisfaction with the assignment of an initial disability evaluation where the disability in question has just been recognized as service-connected. VA must assess the level of disability from the date of initial application for service connection and determine whether the level of disability warrants the assignment of different disability ratings at different times over the life of the claim-a practice known as "staged rating." See also Hart v. Mansfield, 21 Vet. App 505 (2007). In this case, there has not been a material change in the level of impairment in the left knee and uniform ratings are warranted. 

The Veteran bears the burden of presenting and supporting his claim for benefits. 38 U.S.C.A. § 5107(a). In its evaluation, the Board considers all information and lay and medical evidence of record. 38 U.S.C.A. § 5107(b). When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Board gives the benefit of the doubt to the claimant. Id. 

Under the anti-pyramiding provision of 38 C.F.R. § 4.14 , the evaluation of the "same disability" or the "same manifestation" under various diagnoses is to be avoided. The Court held, in Esteban v. Brown, 6 Vet. App. 259 (1994), that for purposes of determining whether the appellant is entitled to separate ratings for different problems or residuals of an injury, such that separate evaluations do not violate the prohibition against pyramiding, the critical element is that none of the symptomatology for any one of the conditions is duplicative of, or overlapping with, the symptomatology of the other conditions. 

The assignment of a particular diagnostic code is "completely dependent on the facts of a particular case." See Butts v. Brown, 5 Vet. App. 532, 538 (1993). One diagnostic code may be more appropriate than another based on such factors as an individual's relevant medical history, the current diagnosis and demonstrated symptomatology. Any change in a diagnostic code by VA must be specifically explained. Pernorio v. Derwinski, 2 Vet. App. 625 (1992). 

The Veteran's hearing loss has been evaluated under 38 C.F.R. § 4.85, DC 6100 (2014). This diagnostic code sets out the criteria for evaluating hearing impairment using puretone threshold averages and speech discrimination scores. Numeric designations are assigned based upon a mechanical use of tables found in 38 C.F.R. § 4.85; there is no room for subjective interpretation. See Acevedo-Escobar v. West, 12 Vet. App. 9, 10 (1998); Lendenmann v. Principi, 3 Vet. App. 345, 349 (1992).

Audiometric results are matched against Table VI to find the numeric designation, then the designations are matched with Table VII to find the percentage evaluation to be assigned for the hearing impairment. To evaluate the degree of disability for service-connected hearing loss, the Rating Schedule establishes 11 auditory acuity levels, designated from level I for essentially normal acuity, through level XI for profound deafness. 38 C.F.R. § 4.85. When impaired hearing is service connected in one ear only, the non-service-connected ear will be assigned a designation of level I from Table VII. 38 C.F.R. § 4.85(f).

The provisions of section 4.86 address exceptional patterns of hearing loss, which are defined as when each of the puretone thresholds at 1000, 2000, 3000, and 4000 hertz (Hz) are 55 decibels or more, or when the puretone threshold is 30 decibels or less at 1000 Hz and 70 decibels or more at 2000 Hz. 38 C.F.R. § 4.86.

An April 2008 VA audio consult shows that puretone thresholds, in decibels, were as follows:




HERTZ



1000
2000
3000
4000
Average
RIGHT
25
45
65
70
51
LEFT
35
75
70
75
64

Speech audiometry revealed speech recognition ability of 92 percent in the right ear at 70 dB and 80 percent in the left ear at 70 dB and 76 percent in the left ear at 80 dB. 

The results of the April 2008 audiogram show an average puretone threshold of 51 decibels in the right ear with speech recognition ability of 92 percent rating; and an average puretone threshold of 64 decibels in the left ear with speech recognition ability of 76 to 80 percent. Exceptional patterns of hearing loss are not shown, pursuant to 38 C.F.R. § 4.86(a), as each of the puretone thresholds at 1000, 2000, 3000, and 4000 hertz (Hz) is not 55 decibels or more. While puretone threshold at 2000 Hz is at 75 dB in the left ear, puretone threshold at 1000 Hz is not at 30 dB or less in the left; nor is puretone threshold at 30 dB or less at 1000 Hz and 70 dB at 2000 Hz in the right ear. Table VI indicates a numeric designation of I for the right ear and IV for the left ear. The point of intersection on Table VII reflects the level of hearing loss is consistent with a 0 percent evaluation.

On authorized VA audiological evaluation in September 2008, puretone thresholds, in decibels, were as follows:




HERTZ



1000
2000
3000
4000
Average
RIGHT
30
50
70
75
56
LEFT
35
75
75
75
65

Speech audiometry revealed speech recognition ability of 84 percent in both ears. 

The results of the September 2008 audiogram show an average puretone threshold of 56 decibels in the right ear with speech recognition ability of 84 percent rating; and an average puretone threshold of 65 decibels in the left ear with speech recognition ability of 84 percent. Exceptional patterns of hearing loss are not shown, pursuant to 38 C.F.R. § 4.86(a), as each of the puretone thresholds at 1000, 2000, 3000, and 4000 hertz (Hz) is not 55 decibels or more. While puretone threshold at 2000 Hz is at 75 dB in the left ear, puretone threshold at 1000 Hz is not at 30 dB or less in the left; nor is puretone threshold at 30 dB or less at 1000 Hz and 70 dB at 2000 Hz in the right ear. Table VI indicates a numeric designation of II for the right ear and III for the left ear. The point of intersection on Table VII reflects the level of hearing loss is consistent with a 0 percent evaluation.

On the authorized VA audiological evaluation in June 2010, puretone thresholds, in decibels, were as follows:




HERTZ



1000
2000
3000
4000
Average
RIGHT
30
50
75
70
56
LEFT
40
80
75
70
66

Speech audiometry revealed speech recognition ability of 76 percent in the right ear and 68 percent in the left ear. The Veteran reported significant occupational effects in that he had difficulty following instructions. 

The results of the June 2010 audiogram show an average puretone threshold of 56 decibels in the right ear with speech recognition of 76 percent, and 66 decibels in the left ear with speech recognition ability of 68 percent. Once again, exceptional patterns of hearing loss are not shown, pursuant to 38 C.F.R. § 4.86(a). Table VI indicates a numeric designation of IV for the right ear and VI for the left ear. The point of intersection on Table VII reflects the level of hearing loss is consistent with a 20 percent evaluation, which is the rating the RO assigned, effective the date of the audiology examination, June 5, 2010.

A September 2012 VA audio consult shows that puretone thresholds, in decibels, were as follows:




HERTZ



1000
2000
3000
4000
Average
RIGHT
20
50
65
70
51
LEFT
55
75
70
70
68

Speech audiometry revealed speech recognition ability of 84 percent in the right ear and 82 percent in the left ear. 

The results of the September 2012 audiogram show an average puretone threshold of 51 decibels in the right ear with speech recognition of 84 percent, and 68 decibels in the left ear with speech recognition ability of 82 percent. Exceptional patterns of hearing loss are not shown in the right ear, pursuant to 38 C.F.R. § 4.86(a); however, they are shown in the left ear as each of the puretone thresholds at 1000, 2000, 3000, and 4000 Hz is 55 decibels or more. Table VI indicates a numeric designation of II in the right ear. Table VIa, which is more favorable for the left ear's exceptional pattern of hearing indicates a numeric designation of V for the left (as opposed to IV under Table VI). The point of intersection on Table VII reflects the level of hearing loss is consistent with a 10 percent evaluation, which is lower than the 20 percent rating assigned by the RO for this time frame.

Finally, on the authorized VA audiological evaluation in November 2012, puretone thresholds, in decibels, were as follows:




HERTZ



1000
2000
3000
4000
Average
RIGHT
30
60
75
80
61
LEFT
60
80
90
90
80

Speech audiometry revealed speech recognition ability of 58 percent in the right ear and 66 percent in the left ear. The Veteran reported that he had difficulty hearing and understanding speech.

The results of the November 2012 audiogram show an average puretone threshold of 61 decibels in the right ear with speech recognition of 58 percent, and 80 decibels in the left ear with speech recognition ability of 66 percent. Exceptional patterns of hearing loss are not shown in the right ear, pursuant to 38 C.F.R. § 4.86(a); however, they are shown in the left ear as each of the puretone thresholds at 1000, 2000, 3000, and 4000 Hz is 55 decibels or more. Table VI indicates a numeric designation of VII in the right ear. Tables VI and Via both indicate a numeric designation of VII for the left ear, as well. The point of intersection on Table VII reflects the level of hearing loss is consistent with a 40 percent evaluation, which is the rating assigned by the RO, as of the date of this examination on November 26, 2012.

The Veteran asserts that he is entitled to higher ratings for his hearing loss disability. As evidenced above, however, notwithstanding the Veteran's complaints, the audiograms did not show a staged levels of hearing loss warranting ratings higher than 0 percent, 20, and 40 percent at their respective effective dates of September 9, 2008, June 5, 2010, and November 26, 2012. To the extent that his hearing is impaired, the fact that the Veteran's hearing acuity is less than optimal does not by itself establish entitlement to a higher disability rating. To the contrary, it is clear from the Rating Schedule that a higher rating can be awarded only when loss of hearing has reached a specified measurable level. The medical evidence does not support the assignment of ratings higher than those assigned during the entire appeals period. The Board notes that the audiogram provided in September 2012 actually indicates a disability rating of 10 percent, which is lower than the assigned 20 percent rating. However, the Board will not disturb the ratings assigned by the RO.

To the extent that the Veteran asserts entitlement to a higher rating for his hearing loss, while the Board acknowledges the Veteran's complaints, entitlement to an evaluation in excess of the ratings assigned has not been demonstrated in the present case. See Hart v. Mansfield, 21 Vet. App. 505 (2007).

For all the foregoing reasons, the Board finds that the evidence does not support the assignment of ratings higher than 0 percent, effective September 9, 2008, 20 percent, effective June 5, 2010, and 40 percent, effective November 26, 2012. Therefore, entitlement to an increased rating for the impairment associated with bilateral hearing loss is not warranted. 

To the extent that the Veteran has contended that his hearing loss is more severely impaired than the rating assigned, the preponderance of the evidence is against the claim; and the benefit of the doubt doctrine is not applicable. See Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

III. Extraschedular Ratings

The rating schedule represents as far as is practicable, the average impairment of earning capacity. Ratings will generally be based on average impairment. See 38 C.F.R. § 3.321(a), (b) (2014). To afford justice in exceptional situations, an extraschedular rating can be provided. See 38 C.F.R. § 3.321(b). 

The Court clarified the analytical steps necessary to determine whether referral for extraschedular consideration is warranted in Thun v. Peake, 22 Vet. App. 111 (2008). First, the RO or the Board must determine whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Second, if the schedular evaluation does not contemplate the veteran's level of disability and symptomatology and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the C&P Service to determine whether, to accord justice, the veteran's disability picture requires the assignment of an extraschedular rating. 

The symptoms associated with the Veteran's the hearing loss (i.e., difficulty hearing instructions and understanding speech and hearing the television) are not shown to cause any impairment that is not already contemplated by the rating criteria. The 0, 20, and 40 percent ratings assigned under 38 C.F.R. § 4.85 contemplate symptoms such as decreased hearing. 

Thus, the Board finds that these rating criteria reasonably describe the Veteran's disabilities. For these reasons, referral for consideration of an extraschedular rating is not warranted for this claim.

IV. Inferred TDIU

An inferred claim for a TDIU under Rice v. Shinseki, 22 Vet. App. 447 (2009) also has been considered. The Veteran's hearing loss was shown to have significant occupational effects on examination in June 2010. However, the Veteran does not contend, nor does the record show that the Veteran has been rendered unemployable as a result of his hearing loss disability. Therefore, any inferred TDIU claim is inapplicable in this case. In addition, the Board notes that the issue of entitlement to a TDIU is addressed in the separate Board decision and is favorable to the Veteran based on evidence that his back disability renders him unemployable.


ORDER

Entitlement to a higher initial rating for bilateral hearing loss, evaluated as
0 percent disabling prior to June 5, 2010, 20 percent disabling from June 5, 2010, and 40 percent disabling from November 26, 2012 is denied.




REMAND

The Board previously remanded the claim in July 2012, in part, so that an examination could be provided to address the etiology of the Veteran's left knee disability. It was noted that the Veteran had testified during the June 2011 hearing that he injured his left knee in approximately 1955 when unloading a heavy cable, which rolled into him. The examiner was to consider the Veteran's competent statements regarding occurrence of the in-service injury, post-service injury to the left knee in 1977, 2006, and 2007, as well as a private opinion in March 2009 from Dr. B. that the Veteran's left knee disorder was related to an old military injury. 

Thereafter, an examination and opinion was provided in November 2012, in which the examiner found that the Veteran's left knee disability was not related to service. The rationale was that there was no evidence of treatment for a left knee condition on record of medical history in 1964 and that the first symptoms in the left knee were in 1977, nine years after active duty. The examiner noted an injury in 2006 and that he was still able to ski in 2007 and therefore found that it was more likely than not that the Veteran's left knee disability was associated with the 1977 injury. The examiner also noted the positive medical opinion in March 2009 from Dr. B. that the Veteran's left knee injury was associated with an old military injury. The examiner found that there was no evidence that Dr. B. had reviewed any previous medical treatment documentation for the left knee and that there was no weight of medical evidence supporting an in-service left knee condition. 

The Veteran's representative submitted argument in February 2015 asserting that the VA examiner in November 2012 did not consider the Veteran's competent assertions of injury to the left knee in service and his continued problems with the left knee after service, including his contention that the post-service injuries to the left knee were a result of his initial injury in service. The representative also noted that the examiner's rationale was in large part based on there being no documentation of a left knee injury in service; but that the lack of contemporaneous medical records did not make the Veteran's assertions not credible, especially considering some of his service treatment records are unavailable. 

The Board finds that the November 2012 opinion addressing the etiology of the left knee disorder is incomplete, as the examiner does not appear to give any weight to the Veteran's assertions of left knee injury in service or continued symptoms in the left knee after service, including his contention that his post-service injuries in 1977, 2006, and 2007 were an aggravation of his initial injury to the left knee in service. The examiner also concludes that the current left knee disability is more likely related to the post-service injury in 1977 rather than the injury to the knee in service; but does not offer any rationale for this distinction. For these reasons, a supplemental opinion regarding the etiology of the left knee disability is warranted.

With respect to the service connection claim for vertigo, the examiner in November 2012 provided a diagnosis of benign positional vertigo and found that this was not related to the Veteran's reported of vertigo episode in service. However, the examiner did not provide any rationale for this opinion. Therefore, a supplemental opinion is warranted prior to adjudication of the service connection claim for vertigo, as well. 

Finally, both the Veteran at his June 2011 hearing and VA treatment records show that the Veteran primarily receives his primary care medical treatment from private doctors, Drs. B. and M. The Veteran testified that Drs. B. and M. told him that his current vertigo is due to damage to his ears sustained in the military. He also noted treatment for his back and knees from these doctors.

After the Board's July 2012 remand, the Veteran provided signed Authorizations for Release of Information VA Forms 21-4142 allowing VA to obtain treatment records for Drs. B. and M. dated in August 2012. The Veteran also provided a signed release for treatment records from Drs. J. and S. Dr. S. was later noted as being a VA provider. However, the RO did not conduct any follow-up development with respect to these authorizations. In February 2014 the RO sent the Veteran another letter noting that the VA Form 21-4142, Authorization and Consent to Release Information that he had submitted for Drs. S., B., and J. had expired. The RO apologized for the inconvenience and ask the Veteran to complete and return the enclosed forms so that VA could make efforts to obtain the records. Dr. M. was left off of the letter in February 2014, although there is no record of the RO making efforts to obtain treatment records for Dr. M. either.

The Veteran responded to the RO's request later in February 2014 noting that although the RO had requested that he resubmit the 21-4142s that were previously sent, three of the doctors had passed away and he could not retrieve the records; he further noted that "they were sent before." It is not clear that the Veteran understands that although he had already submitted the release of information that he needs to resubmit the forms due to the RO's inaction and the previous forms expiring. Even if some of the doctors (not all of the doctors) had since deceased, this does not mean that the medical records at the facilities are unavailable. VA treatment records through 2012 show that the Veteran continued to see Dr. B as his primary care physician. Therefore additional efforts should be made to obtain the treatment records from Drs. B., M., and J.

Accordingly, the case is REMANDED for the following action:

(Please note, this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). Expedited handling is requested.)

1. Ask the Veteran again to resubmit the VA Forms 21-4142s regarding treatment he received for his left knee and vertigo from Drs. B., M., and J. Include in the letter the explanation that although he has previously submitted the authorization for release of this information to VA that the previous authorizations have expired since the RO did not make efforts to obtain the records prior to their expiration. Make it clear in the letter that the RO cannot make efforts to obtain the clinical records for Drs. B., M., and J. if the Veteran does not provide the updated authorizations for release of information. If the Veteran complies, make reasonable efforts to obtain the records. If the efforts are unsuccessful notify the Veteran and indicate what further steps VA will make concerning the claim.

2. Ask the Veteran to identify any additional treatment he has received for his left knee and vertigo disabilities. Make arrangements to obtain any records identified.

3. After any additional relevant records are obtained, make arrangements to obtain a supplemental opinion from the VA physician who provided the November 2012 VA examination regarding the etiology of the Veteran's left knee and vertigo disabilities. If deemed necessary, reschedule the Veteran for additional VA orthopedic and/or neurological examinations. The virtual file (including any additional relevant treatment records) and a copy of this remand must be made available to, and reviewed by, the examiner in conjunction with the opinion and/ or examination. The examiner must note that the claims file was reviewed. Any and all indicated studies and tests should be completed. 

The examiner must provide an opinion as to the following:

(a) whether it is at least as likely as not (50 percent probability or more) that the Veteran's current left knee disability had its onset in service or is otherwise related to active service, including his reported injury to the left knee in 1955 in service. 

In making this assessment, the examiner should consider the following:

(1) The Veteran's competent reports of injury to his left knee in service when a cable slid into him; 

(2) The Veteran's competent statements regarding onset of symptoms in his left knee in service, and his contention that his subsequent injury to the knee in 1977, 2006, and 2007 was an aggravation of the previous left knee injury in service; and 

(3) the records of post-service injury to the left knee in 1977, 2006, and 2007. 

(b) whether it is at least as likely as not (50 percent probability or more) that the Veteran's current diagnosis of benign positional vertigo had its onset in service or is otherwise related to active service, including his exposure to acoustic trauma in service. 

In making this assessment, the examiner should consider the following:

(1) The Veteran's competent reports of experiencing vertigo in service and continued symptoms after separation from service; and

(2) the Veteran's presumed exposure to acoustic trauma in service.

Note: The term "at least as likely as not" does not mean merely within the realm of medical possibility, but rather that the weight of medical evidence both for and against a conclusion is so evenly divided that it is as medically sound to find in favor of causation as it is to find against it. 

A complete rationale for any opinion expressed must be provided. If an opinion cannot be expressed without resort to speculation, discuss why this is the case. In this regard, indicate whether the inability to provide a definitive opinion is due to a need for further information or because the limits of medical knowledge have been exhausted regarding the etiology of the disability at issue or because of some other reason. 

4. Thereafter, readjudicate the claim. If the benefit sought remains denied, issue a Supplemental Statement of the Case to the Veteran and provide an opportunity for the Veteran to respond. The case should then be returned to the Board for review.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
S. L. Kennedy
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs